UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

Carla Yeager, Individually, Kayla M.        )
Yeager, Individually and as Mother and      )
Special Administrator of the Estates of     )
M.L.L.S. and B.D.S., and Dawn               )
Summers, Personal Representative of the     )
Estate of Steven J. Summers                 )
                                            )
              Plaintiffs                    )        CASE NO. 4:15-CV-175 RLY-DML
                                            )
vs.                                         )
                                            )
EVENFLO COMPANY, INC., a Delaware           )
Corporation,                                )
                                            )
              Defendant.                    )

**PLAINTIFFS'** *AMENDED* **COMBINED RESPONSE TO DEFENDANT'S
MOTIONS TO EXCLUDE THE OPINION TESTIMONY OF WILLIAM P.
MUNSELL REGARDING THE DESIGN OF THE EVENFLO (A) EMBRACE
AND (B) TRIBUTE And
DAUBERT MOTION DIRECTED TO PLAINTIFFS' BIOMECHANICS/INJURY
CAUSATION EXPERT MARIUSZ ZIEJEWSKI**

## INDEX

TABLE OF AUTHORITIES ............................................................................................. ii

INDEX OF EXHIBITS.................................................................................................... iv

PLAINTIFFS' COMBINED RESPONSE ........................................................................1

AUTHORITY PERTINENT TO ALL MOTIONS ............................................................1

A.   RESPONSE TO MOTIONS REGARDING
     WILLIAM P. MUNSELL, BS., MA., P.E...............................................................5

     1.   METHODOLOGY REGARDING THE EVENFLO EMBRACE.............6

     2.   METHODOLOGY REGARDING THE EVENFLO TRIBUTE ..............10

B.   RESPONSE TO MOTION REGARDING
     MARIUSZ ZIEJEWSKI, PH.D., INŻ.................................................................14

CONCLUSION............................................................................................................16

# TABLE OF AUTHORITIES

## Case Law

*Amorgianos v. Nat'l R.R. Passenger Corp.* (303 F.3d 256 – C.A.2 2002) .........................3

*AVX Corp. v. United States* (518 F. App'x 130 – C.A.4 2013).............................................3

*Calta v. N. Am. Arms, Inc.*
    (2007 WL 4800641 – M.D. Fla. 2007 – Not Reported) ...........................................3

*C.W. ex rel. Wood v. Textron, Inc.* (807 F.3d 827 – C.A.7 2015) .......................................3

*Daubert v. Merrell Dow Pharmaceuticals, Inc.* (509 U.S. 579 – 1993) ........... 1-3, 5, 9, 10

*Erickson v. Baxter Healthcare, Inc.* (151 F. Supp. 2d 952 – N.D. Ill. 2001) .....................5

*Ford v. Nationwide Mut. Fire Ins. Co.* (62 F. App'x 6 – C.A.1 2003) ................................3

*Gopalratnam v. Hewlett-Packard Co.* (877 F.3d 771 – C.A.7 2017)........................ 2-3, 4

*Heller v. D.C.* (952 F. Supp. 2d 133 – D. D.C. 2013) ..........................................................3

*Jahn v. Equine Services, PSC* (233 F.3d 382 – C.A.6 2000)...............................................4

*Krik v. Exxon Mobil Corp.* (870 F.3d 669 – C.A.7  2017) ..................................................4

*Kumho Tire Co., Ltd. v. Carmichael* (526 U.S. 137 – 1999)...............................................5

*Lippe v. Howard* (287 F. Supp. 3d 1271 – W.D. Okla. 2018)..............................................3

*McCloud ex rel. Hall v. Goodyear Dunlop Tires North America, Ltd.*
    (479 F.Supp.2d 882 – C.D. Ill. 2007) ....................................................................3

*Murfam Farms, LLC ex rel. Murphy v. United States*
    (2008 WL 7706607 – Fed. Cl. 2008 – Not Reported) .............................................3

*Nemir v. Mitsubishi Motor Sales of America, Inc.*
    (6 Fed. Appx. 266 – C.A.6 2001) ...........................................................................2

*Olson v. Ford Motor Co.* (481 F.3d 619 – C.A.8 2007)......................................................3

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*
    (998 F.2d 1224 – C.A.3 1993) ................................................................................3

*Pipitone v. Biomatrix, Inc.* (288 F.3d 239 – C.A.5 2002)....................................................3

*Rink v. Cheminova, Inc.* (400 F.3d 1286 – C.A.11 2005)......................................................3

*Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*
    (161 F.3d 77 – C.A.1 1998) ............................................................................3

*Stutzman v. CRST, Inc.* (997 F.2d 291 – C.A.7 1993) ........................................................4

*United States v. Sanchez-Birruetta* (128 F. App'x 571 – C.A.9 2005) .............................3

*United States v. Smithers* (212 F.3d 306 – C.A.6 2000)......................................................3

*Westberry v. Gislaved Gummi AB* (178 F.3d 257 – C.A.4 1999)......................................17

## Statutory Law

Fed. R. Evid. 702 ...............................................................................................1, 2, 4, 5

Fed. R. Evid. 703 ......................................................................................................2, 4

## INDEX OF EXHIBITS

Exhibit 1 –    Excerpts from Deposition of William P. Munsell, B.S., M.A., P.E.

Exhibit 2 –    Excerpts from Deposition of Mariusz Ziejewski, PH.D., INŻ

Exhibit 3 –    Affidavit of William P. Munsell, B.S., M.A., P.E. (Evenflo Embrace)

               This exhibit provides Mr. Munsell's own response to various charges in
               Defendant's motion regarding his work evaluating the Evenflo Embrace.

Exhibit 4 –    Affidavit of William P. Munsell, B.S., M.A., P.E. (Evenflo Tribute)

               This exhibit provides Mr. Munsell's own response to various charges in
               Defendant's motion regarding his work evaluating the Evenflo Tribute.

Exhibit 5 –    Curriculum Vitae of Mariusz Ziejewski, PH.D., INŻ

Exhibit 6 –    Response of Mariusz Ziejewski, PH.D., INŻ

               This exhibit provides Dr. Ziejewski's own response to various charges in
               Defendant's motion.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| Carla Yeager, Individually, Kayla M. Yeager, Individually and as Mother and Special Administrator of the Estates of M.L.L.S. and B.D.S., and Dawn Summers, Personal Representative of the Estate of Steven J. Summers | ) ) ) ) ) ) | |
| Plaintiffs | ) ) | CASE NO. 4:15-CV-175 RLY-DML |
| vs. | ) ) | |
| EVENFLO COMPANY, INC., a Delaware Corporation, | ) ) ) | |
| Defendant. | ) | |

**PLAINTIFFS'** *AMENDED* **COMBINED RESPONSE TO DEFENDANT'S MOTIONS TO EXCLUDE THE OPINION TESTIMONY OF WILLIAM P. MUNSELL REGARDING THE DESIGN OF THE EVENFLO (A) EMBRACE AND (B) TRIBUTE And DAUBERT MOTION DIRECTED TO PLAINTIFFS' BIOMECHANICS/INJURY CAUSATION EXPERT MARIUSZ ZIEJEWSKI**

The three motions at issue constitute an attack of expert opinions Defendant does not like, presented under the guise of a reliability complaint. This is impermissible under relevant law.

**Authority Pertinent to All Motions**

In its notes to the 2000 Amendment to Fed. R. Evid. 702, the Advisory Committee observes (quotations merged, citations omitted): "A review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule. *Daubert* did not work a seachange over federal evidence law, and the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." The Committee further cautions that the rule "is not intended to provide an excuse for the automatic challenge to the testimony of every expert." This holding reflects a growing impatience on the part of trial and appellate jurists with litigants who

pervert the original intent of Rule 702 by deforming the guideposts of *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (509 U.S. 579 – 1993) into clubs.

> In *Daubert* (at 595), the court held (emphasis added):
>
> The inquiry envisioned by Rule 702 is, we emphasize, a flexible one.  *** The focus, of course, must be solely on principles and methodology, **not on the conclusions that they generate**.

The court in *Nemir v. Mitsubishi Motor Sales of America, Inc.* (6 Fed. Appx. 266, 270 – C.A.6 2001), stressed that this flexibility is especially applicable when the test is applied to the testimony of an engineer.  Furthermore (Id. at 275; quotation merged, citation omitted):

> In evaluating an expert witness, *Daubert* and Rule 702 require only that the expert testimony be derived from inferences based on a scientific method and that those inferences be derived from the facts of the case at hand ... not that they know the answers to all the questions a case presents – even to the most fundamental questions.

Thus, no expert is required to eliminate a potentially limitless universe of alternatives.  The central intent of Rule 702 as interpreted by *Daubert* is, in the words of the *Nemir* court, "simply to afford the Court limited control over extreme and unreliable" expert testimony (Id., fn. 35).

> In *Gopalratnam v. Hewlett-Packard Co.* (877 F.3d 771, 780-1 – C.A.7 2017) (quotation merged, citations omitted), the court expanded on the *Daubert* interdiction against the misapplication of Rules 702 and 703:

> The district court's role as gatekeeper does not render the district court the trier of all facts relating to expert testimony.  The jury must still be allowed to play its essential role as the arbiter of the weight and credibility of expert testimony. Rather, Rule 702's reliability elements require the district judge to determine only that the expert is providing testimony that is based on a correct application of a reliable *methodology* and that the expert considered sufficient data to employ the methodology.  This examination does not ordinarily extend to the reliability of the *conclusions* those methods produce – that is, whether the conclusions are unimpeachable.  In other words, an expert may provide expert testimony based on a valid and properly applied methodology and still offer a

conclusion that is subject to doubt.  It is the role of the jury to weigh these sources of doubt.

The district court usurps the role of the jury, and therefore abuses its discretion, if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed.  (Id. at 781)

Among the pithier restatements of this precept are: (a) an expert may not be excluded because his counterpart is more persuasive than he (*Rink v. Cheminova, Inc.* – 400 F.3d 1286, 1293 fn. 7 – C.A.11 2005); (b) the district court should not "choose one set of facts over another" (*McCloud ex rel. Hall v. Goodyear Dunlop Tires North America, Ltd*. – 479 F.Supp.2d 882, 893 – C.D. Ill. 2007); and (c) the trial court's "role under *Daubert* is that of gatekeeper, not that of armed guard."   (*Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 86 – C.A.1 1998)

It can not be overstated that the federal circuits *unanimously* agree with the canon that the reliability/admissibility of expert testimony must be evaluated on a case-by-case basis (*Ford v. Nationwide Mut. Fire Ins. Co.* – 62 F. App'x 6, 9 – C.A.1 2003; *Amorgianos v. Nat'l R.R. Passenger Corp.* – 303 F.3d 256, 266 – C.A.2 2002; *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.* – 998 F.2d 1224, 1238 – C.A.3 1993; *AVX Corp. v. United States* – 518 F. App'x 130, 135 – C.A.4 2013; *Pipitone v. Biomatrix, Inc.* – 288 F.3d 239, 245 – C.A.5 2002; *United States v. Smithers* – 212 F.3d 306, 320 – C.A.6 2000; *C.W. ex rel. Wood v. Textron, Inc.* – 807 F.3d 827, 835 – C.A.7 2015; *Olson v. Ford Motor Co.* – 481 F.3d 619, 628 – C.A.8 2007; *United States v. Sanchez-Birruetta* – 128 F. App'x 571, 572–73 – C.A.9 2005; *Lippe v. Howard* – 287 F. Supp. 3d 1271, 1278 – W.D. Okla. 2018; *Calta v. N. Am. Arms, Inc.* – 2007 WL 4800641, at \*3 – M.D. Fla. 2007 – Not Reported; *Heller v. D.C.* – 952 F. Supp. 2d 133, 140 – D. D.C. 2013; *Murfam Farms, LLC ex rel. Murphy v. United States* – 2008 WL 7706607, at \*1 – Fed. Cl. 2008 – Not Reported). Therefore, fact-specific rulings about particular experts in other cases are immaterial to this Court's

analysis.

An expert's testimony is admissible if it is (a) based on a reliable foundation and (b) relevant (*Krik v. Exxon Mobil Corp.* – 870 F.3d 669, 674 – C.A.7 2017). A lack of "supporting studies is not, in itself, fatal to the admissibility" of expert testimony (*Jahn v. Equine Services, PSC* – 233 F.3d 382, fn. 8 – C.A.6 2000). Even a lack of "absolute certainty goes to the weight of [an expert's] testimony," not its admissibility (*Stutzman v. CRST, Inc.* – 997 F.2d 291, 296 – C.A.7 1993). Courts should afford experts wide latitude in their opinions, including opinions not based on firsthand knowledge. As the court in *Gopalratnam* (877 F.3d 771 at 789) noted:

> It is common in technical fields for an expert to base an opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert. *** Such a scenario is explicitly contemplated by the Rules of Evidence.

The *Gopalratnam* court cited Rule 703, noting its alternative requisite that an expert may base an opinion on facts or data he has either "been made aware of" or "personally observed." Plaintiffs would note that Rule 702 bears the same disjunctive connector: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify ...." In other words, there is not just one accepted avenue to expertise; there are several. As the Advisory Committee illustrates:

> Nothing in this amendment is intended to suggest that experience alone – or experience in conjunction with other knowledge, skill, training or education – may not provide a sufficient foundation for expert testimony. To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony.

Hence, contrary to the typical complaint of products liability defendants, an expert need not conduct an independent test for every opinion he tenders. The logical corollary is that, regardless of whether a party attacks an expert's qualifications *per se*, Rule 702 makes the expert's qualifications integral to defending his methodology.

4

Nor does federal law require an expert to return to the drawing board and conduct a formal, documented analysis in the event he clarifies or amends his opinion.  To the contrary, adapting one's conclusions to fit an ever-evolving data field lies at the heart of the scientific method.  This truism is reflected by the court's rejoinder in *Erickson v. Baxter Healthcare, Inc.* (151 F. Supp. 2d 952, 968 – N.D. Ill. 2001):

> The defendants also suggest that Dr. Mosley's change in opinion based on new records makes all of his opinions unreliable, but this is frivolous. The failure to cite scholarly articles does not render his opinions unreliable in light of his experience in this field; one would hope that a trained epidemiological expert need not consult a journal to discuss the symptoms of hepatitis or HIV.

Finally, in *Kumho Tire Co., Ltd. v. Carmichael* (526 U.S. 137, 152-3 – 1999), the Court clarified that the trial court has discretion to altogether dispense with the *Daubert* inquiry (termed an "unnecessary reliability" proceeding) in a case where the expert's methods are so conventional that they are "properly taken for granted ...."

## A.      RESPONSE TO MOTIONS REGARDING WILLIAM P. MUNSELL, BS., MA., P.E.

To his analysis of the child seats in the underlying action, Mr. Munsell brought the following knowledge, experience and education: a B.S. in Mechanical Engineering (Rule 26 Report of William P. Munsell, B.S., M.A., P.E.; Doc. 147-1, at 8); an M.A. in History of Science, Technology and Medicine (Id.); his current work toward a Ph.D. in the same field (Id.); compliance with all of the requisites for registration in Oklahoma as a Professional Engineer for over 2 decades[1]; and a career spanning a quarter-century in which he has specialized in the failure analysis of mechanical systems, including automotive child restraints – a career which has seen him develop and successfully obtain 3 patents on automotive child restraints (Id. at 1, 9).  During that time, he served as Vice President of Engineering at a child restraint system manufacturer and

---

[1] www.ok.gov/pels/search/searchdetail.php?regnum=18494&group=PE.

Director of Engineering at a company devoted to product design, standards testing and design evaluation, whose activities involved full-scale on-track and sled testing which included child restraints (Id. at 9).

To determine if the design of the subject child seats and/or components thereof were unreasonably dangerous, Mr. Munsell reviewed a number of scientific treatises relevant to mechanical safety measures (Id. at 1-2), including three addressing material aspects of children in car seats (Id. at 2). He reviewed the applicable Federal Motor Vehicle Safety Standard (Id. at 1). He reviewed relevant U.S. patents (Id. at 2). He reviewed the official accident report, all depositions to date and all documents produced in discovery by Defendant (Id. at 1-2). He proceeded to inspect and measure the subject child seats and vehicle, exemplars of the subject child seats and vehicle, and competitor automotive child seats (Id. at 2). He also performed testing of the exemplar Embrace and competitor child seats (Id.), and reviewed Evenflo's own testing of its products (Id. at 4).

Mr. Munsell's counterpart in this case brought to his end of the table comparable education and experience (Rule 26 Report of William W. Van Arsdell, Ph.D., P.E.; Doc. 146-2, at 1), reviewed much the same categories of materials (Id. at 2-4), inspected the subject child seats and vehicle (Id. at 4-6), participated in testing of the subject child seats (Id. at 6) and reviewed Evenflo's own testing of its products (Id. at 7).

## 1.   METHODOLOGY REGARDING THE EVENFLO EMBRACE

The logical starting point for any reputable expert evaluating a vehicular accident is the testimony of the first professional responder on scene. In this case, that first responder was EMT Colin Boreham, who reported that he "found M.L.L.S. behind the driver's seat and the carrier portion of the Embrace system wedged" between the headrests of the front driver and passenger

seats (Doc. 147-1 at 3).  Mr. Munsell's next logical step was to determine if the physical evidence supported this observation (Id.):

> The physical evidence in the case supports Mr. Boreham's testimony about the location of the carrier after the accident. Stress-whitening around the perimeter of the carrier is consistent with impacts from multiple directions and inconsistent with a carrier that has remained fixed to the base during the accident. The front passenger seat head rest has been broken off of its mounting, consistent with an impact. The front passenger seat also displays witness marks immediately to the right of the head rest area consistent with an object striking the seat from the rear at great speed. In addition to these indicators, one of the two wireloop anchors designed to retain the carrier in the base was found to have failed. The wireloop and its spring were found elsewhere in the vehicle after the accident. The other wireloop was found to be intact and undeformed, but stress-whitening in the plastic around the anchor show that this side experienced a degree of loading during the accident as well.

This evidence pointed to the reasonable hypothesis that the carrier was not completely latched prior to the accident, and that the wireloop anchors were too weak to prevent a partially latched seat from detaching in a similar accident (Id.).  To test this theory, Mr. Munsell reviewed Evenflo's testing of the child seats, where he found that "even trained Evenflo technicians using a 22lbs dummy[2] failed to achieve proper anchor engagement, leading to full separations of the carrier from the base in testing.  This result was characterized by Eric Dahle, Evenflo representative, as 'unacceptable.'"  (Id. at 4)  Based on this evidence alone, Mr. Munsell's hypothesis was borne out. But Mr. Munsell was not satisfied until he had replicated those tests on his own, using both the Embrace and 3 of its competitors (Id.).

According to the pertinent law as set out above, the Court's enquiry should end here with the conclusion that Mr. Munsell has (a) employed a methodology which is, not only reliable, but so commonplace as to be unassailable (b) to test a reasonable inference drawn directly and dispassionately from the available evidence (c) which inference is informative to the jury regarding

---

[2] Mr. Munsell notes at footnote 11 that the best scientific estimate of the weight of B.D.S. at the time of the accident was 18.5 lbs.

whether the Evenflo Embrace is defective.  Mr. Munsell's conclusions are outside the realm of the Court's assessment.

Nonetheless, Defendant has gone to great lengths to discredit those conclusions by manufacturing methodological fault where none exists, and it does this principally by cherry-picking only self-serving snippets of, and thus misreporting, deposition testimony.  Though responding to specific instances of this is immaterial to a determination of the underlying motion, Plaintiffs beg the Court's indulgence so that they may set the record straight, both here and in response to the remaining motions.  Because Plaintiffs do not wish take this inquiry on too long of an irrelevant detour, they will limit their refutations to only representative examples.

Partial latching is not a speculative theory.  From his background, Mr. Munsell has determined it to be highly improbable the seat would have detached if fully engaged (Exhibit 1 at 38/8-12).  And Evenflo testing supports it (Id. at 85/20 to 86/24).  Finally, there is physical evidence supporting partial latch (Id. at 203/15 to 204/8).

During his deposition, defense counsel pressed Mr. Munsell on why he did not evaluate the alternative scenario that the seatbelt holding the car seat to the car was left loose.  Mr. Munsell explained that there is no scientific way to assess this or similar possibilities (Id. at 98/13 to 99/10, 206/7-25).  Furthermore, differing amounts of slack are foreseeable to Evenflo (Id. at 197/24 to 198/19).  Finally, the retractor is designed to eliminate inadvertent slack (Id. at 209/12 to 210/22).

Finally, when defense counsel obtained his "admission" that he did not consider the alternative scenario that it was contact with the release lever which caused the car seat to detach, Mr. Munsell offered a scientifically logical explanation as to why (Id. at 108):

> 23   A.   But I have looked at the -- something that
> 24   would be necessary for that to happen; and that is,
> 25   you would have to have motion on the seat relative of
> 109

> 1  one surface rubbing past another, and that evidence
> 2  doesn't exist.

The inequity inherent in the *Daubert*/702 process is that, thanks to the traditional pretrial schedule, only the defense experts get a chance to review their opponents' reports before completing and submitting their own.  This gives defense experts an undue advantage, falsely painting their reports with enhanced certitude.  Therefore, Plaintiffs attach Mr. Munsell's affidavit (Exhibit 3), adopting and incorporating it here, in which he responds directly to Defendant's various criticisms regarding his work on the Embrace; specifically:

- He recounts his extensive education and experience material to his task in this case (Id., ¶¶2-9);

- He explains and attests to how he followed "standard investigative and mechanical engineering practices" in forming his opinions (Id., ¶12);

- He itemizes all bases for each of his 6 opinions, which include (but are not limited to) Defendant's own testing, information from the National Highway Traffic Safety Administration, 59 tests Mr. Munsell has personally conducted, design practices endorsed by the National Safety Council, Evenflo's own performance specifications and Federal Motor Vehicle Safety Standard 213 (Id., ¶¶13-18);

- He points out that Defendant's criticisms of his work couched in terms of causation are misleading, as determining causation was not his task in this case (Id., ¶19);

- He nonetheless proceeds to catalog the many reasons Defendant's alternative causation theory (that the car seat was installed too loosely) "is unscientific, and fails the *Daubert* test because it contradicts testimony, physical evidence, and

physics" (Id. at ¶20-1);

- He refutes Defendant's "real-world" characterization as an unscientific red herring (Id. at ¶22;

- To rebut Defendant's charge that he wrongly distributed the weight in his latch activation tests, he rejoins that he "consulted peer-reviewed anthropomorphic treatises to determine" its proper location (Id. at ¶23); and,

- He refutes Defendant's claim that the evidence does not point to partial engagement (Id. at ¶24.

## 2.      METHODOLOGY REGARDING THE EVENFLO TRIBUTE

Again, Mr. Munsell's analysis began with the physical evidence – witness marks on the webbing of the 5-point harness "demonstrated that the chest clip had slid down the webbing during the accident between 8 and 9 inches." (Doc. 147-1 at 6)  From his own sled testing which involved seats with chest clips (Deposition of William P. Munsell, Exhibit 1, at 115/18-25), his visual inspection and interpretation of "the geometry of the 5-point harness" (Doc. 147-1 at 7) and his wealth of education and experience in safety systems engineering referred to above, Mr. Munsell determined that this amount of downward displacement, which is contrary to Evenflo's written objective, defeats the efficacy of the shoulder webbing, reducing the 5-point harness "effectively ... to a lap belt system." (Id.)  The rather obvious engineering upshot is that this amount of slippage permits the child's head and torso "to rotate forward during impact." (Id.)  His review of several patents including that of a competitor, as well as his inspection of a later model Evenflo seat, confirm (a) the importance of keeping the chest clip in place and (b) the feasibility of designing a chest clip which will stay in place (Id. at 7; Exhibit 1 at 193/3-15).  This description of Mr. Munsell's methodology satisfies the reliability test of the applicable law outlined above.

This is an apt juncture to address an instance of Defendant's misrepresentation of deposition testimony alluded to above.  To attack Mr. Munsell's *conclusion* that slippage of the chest clip will result in the head and torso moving forward in the shoulder harness, Defendant alleges (Brief at 4):

> In this case it is undisputed that, notwithstanding any chest clip movement during the accident, the shoulder harness restrained the child, contrary to what Mr. Munsell suggests. Plaintiffs' injury causation and biomechanics expert, Marius Ziejewski, erroneously stated in his expert report that M.L.L.S. slipped the shoulder harness during the accident and struck her head on the back of the driver's headrest. However, when confronted at his deposition with the report of the medical examiner proving there was physical evidence of shoulder restraint (bruising on the shoulders) and no evidence a blow to the head caused the death of the child, Dr. Ziejewski admitted the opinion contained in his report was wrong.

But a close reading of the relevant testimony and documentary evidence shows that Defendant is playing fast and loose with semantics.

Mr. Munsell never suggested M.L.L.S. completely escaped the shoulder harness.  The precise wording used in his report is "rotate forward during impact" (Doc. 147-1 at 7).  And in his deposition, he states quite straightforwardly that he did not even evaluate whether the child's "shoulder straps moved off the shoulders," confirming the simple fact of physics that, for the chest clip in this accident to have excursed at all, it had to be pushed by the forward motion of the child against the shoulder harness (Exhibit 1 at 187/17 to 188/5).  Nevertheless, as we will see below, Dr. Ziejewski points out how Defendant has not refuted the scientific probability that the shoulders of M.L.L.S. did, indeed, slip from the harness in the process of displacing that chest clip.

Though he cites impact with the driver's headrest as a preliminary hypothesis (Rule 26 Report of Mariusz Ziejewski, PH.D., INŻ; Doc. 146-7 at 12), Dr. Ziejewski's conclusion identifies the true culprit as "brain/neck trauma resulting from a combination of linear and angular accelerations" (Id. at 19).  As he later explains, the precise mechanism of injury is the sudden

forward motion (Deposition of Dr. Ziejewski, Exhibit 2, at 21/15 to 22/16).  Nonetheless, while

his opinions were never exclusively dependent on a head strike (hence, contrary to Defendant's

contention, absence of a head strike is not fatal to his opinion), he does not rule it out completely

(Id. at 89):

```
4              And as we already discussed,
5         you now agree that there was no head strike
6         to the back of the headrest; true?
7     A   Very unlikely.  We don't have -- I don't have
8         physical evidence that I can say that head
9         contact occur.  I don't know if I will go
10        that far as saying 100 percent did not
11        occur.
12              From injury perspective, we
13        have a tension, a flexion and possibly
14        extension or some contact.  There can be a
15        head contact with no evidence.
```

When defense counsel attempts to trick Dr. Ziejewski into agreeing that abrasions on the child's

shoulder indicate she remained fully and properly restrained, Dr. Ziejewski uses the same evidence

to point out a more commonsensical engineering interpretation (Id. at 90):

```
3     Q   Okay.  And as we also discussed when we
4         looked at the autopsy report and the evidence
5         of markings on the shoulder with respect to
6         M.L.L.S., the two year-old in the Tribute,
7         there is also no evidence that her shoulders
8         rolled out of the harness; true?
9     A   I don't know what kind of evidence you would
10        expect to see.  You have abrasions, so you
11        know there is a motion of the chest into
12        the... Into the space between the harnesses.
13              And with the clip going down,
14        obviously, the opening is created.  And
15        whether or not, uh -- obviously, because
16        dummy, that's not biofidelic, was far from
17        being biofidelic, it doesn't slip out.  It
18        doesn't mean the child wouldn't.
```

As with the previous motion, Plaintiffs would address here just an illustrative example of

how Defendant has misused deposition testimony.  When, in his deposition, he is taken to task for

not evaluating whether the accident outcome would have differed if a tether had been used, Mr.

Munsell refers to the very first opinion listed in his Rule 26 report (Exhibit 1 at 112):

> 14   A.   "Since many vehicles do not have a LATCH
> 15   system or a top tether, installation of the Tribute
> 16   child restraint with only the vehicle's lap/shoulder
> 17   belt is a foreseeable use of this product."

Finally, Plaintiffs adopt and incorporate Mr. Munsell's affidavit (Exhibit 4), wherein:

- He recounts his extensive education and experience material to his task in this case (Id., ¶¶2-10);

- He explains and attests to how he followed "standard investigative and mechanical engineering practices" in forming his opinions (Id., ¶13);

- He itemizes all bases for each of his 4 opinions, which include (but are not limited to) patents published by major child seat manufacturers, rudimentary physics, Evenflo's own testing and Evenflo's performance specifications (Id. at ¶¶14-17);

- He again cites the distinction between his role in this case (determination of defect) and that of Dr. Ziejewski (causation of injury) (Id. at ¶18); and,

- He points out that the tests cited by Defendant failed to utilize "an anthropomorphic dummy that attempts to accurately model the elastic properties of an actual child's torso or shoulder bone structure.  None of those tests measure the slippage of the chest clip during the test.  None of those tests measure the excursion of the occupant."  (Id., ¶19)

**B.**     **RESPONSE TO MOTION REGARDING MARIUSZ ZIEJEWSKI, PH.D., INŻ.**

Dr. Ziejewski's *curriculum vitae* is so extensive that, even when compiled in a smaller than

normal font, it spans 24 pages (Exhibit 5).  But Dr. Ziejewski highlights pertinent background in

his report (Doc. 146-7 at 1-2):

- Involved in research and education in field of vehicle dynamics and biomechanics for over past 35 years.
- Research focus on human body biomechanics for last 25 years.
- Consulted, for past 25 years, in area of biomechanics, with various governmental agencies including National Highway Traffic Safety Administration (NHTSA), United States Air Force (USAF), United States Army, Department of Defense (DoD), and United States Product Safety Commission (USCPSC).
- Selected to conduct research for USAF at Armstrong Aerospace Research Laboratory (AARL)/Human Systems Division, Wright-Patterson Air Force Base (WPAFB) Dayton, OH, that included laboratory studies of entire human body responses to impact, biodynamic modeling and development of biodynamics injury criteria; and received six (6) research contracts, from USAF that involved biomechanical analysis of over 900 full scale laboratory tests with male and female pilots.

***

- Involved for several years in Emergency Room (ER) Biomechanical Brain Injury Evaluation Research, with Fargo-Moorhead (FM) Ambulance Service and MeritCare Trauma Center, sponsored, in part, by MeritCare Foundation, Fargo, ND.

***

- Current Chairman of North American Brain Injury Society (NABIS).

***

- Published four (4) book chapters on brain and neck injury and over one-hundred (100) peer-reviewed publications.

To perform his biomechanical analysis of the collision forces acting upon M.L.L.S. and

B.D.S., Dr. Ziejewski reviewed the official accident report, medical and autopsy reports, witness

and party depositions to date, the CDR report, and the reports of Plaintiffs' experts Bruce Enz

(reconstructionist) and William P. Munsell (Id. at 2).  He also drew upon no less than 61 scientific

publications on the mechanism of brain injury, a substantial portion of which explore the dynamics

of non-impact acceleration forces such as "blast" and "shock" waves (Id. at 14-19).  He proceeded

to inspect and photograph the subject vehicle and car seats, and exemplar car seats, and to perform

a surrogate study for each with a second exemplar vehicle/car seat (Id. at 3, 7-9).  He also

14

determined the children's geometry and mass, as well as their joint locations and range of motion attributes using a well established computer program which the Court will no doubt recognize – GEBOD (Id. at 3). Dr. Ziejewski explains the complicated and meticulous process he undertook to evaluate this case:

> Human body dynamics analysis requires a thorough understanding complex interaction between different parameters including but not limited to: change in velocity (delta v), direction and duration of impact, gender, height, weight, body position and vehicle interior including the geometry of the car seat and others. For several decades many research publications have addressed the complexity of the response of visco-elastic nature of the human body under a variety of loading conditions. As a part of my research work at the Armstrong Aerospace Research Laboratory at Wright Patterson Air Force Base I have been personally involved in the analysis of more than nine hundred (900) tests with male and female pilots under different loading conditions.
>
> In this case, I performed an analysis using engineering principles and methodologies generally accepted in the scientific community. Example references are listed below:
>
> > *Hibbler, R.C., "Engineering Mechanics – Dynamics", Twelfth Edition, Pearson Prentice Hall, Pearson Education, Inc. 2010*
> >
> > *Nahum, A., Gomez M., "Injury Reconstruction: The Biomechanical Analysis of Accidental Injury", Society of Automotive Engineers, #940568.*
> >
> > *Robbins, D.H., et al, "Biomechanical Accident Investigation Methodology Using Analytic Techniques", Society of Automotive Engineers, #831609.*
>
> For the brain and spinal injury analysis the occupant's head acceleration needs to be evaluated. To establish whether or not the accelerations were sufficient to cause injury one can analyze at first the two dimensional representation of the event. Under the scenario showing that the two dimensional analysis by itself is sufficient to cause injury, one may terminate the analysis with the conclusion that the forces were more than sufficient to cause injury. If the scenario that the results from a two dimensional analysis are below the human tolerance, one must continue the analysis for a three dimensional scenario.

Like Dr. Ziejewski, Defendant's biomechanist: drew upon his education and experience, as well as relevant scientific literature; reviewed the official accident report, witness and party

testimony, medical records and other expert reports; and performed surrogate studies (Rule 26 Report of Mark R. Sochor, M.D., M.S., FACEP; Doc. 146-3 at 1-3).  Dr. Sochor refers to the foregoing as the "generally accepted methodology" in the field (Id.); therefore, *in the professional opinion of Defendant's very own biomechanics expert*, Dr. Ziejewski's methodology passes the Rule 702/703 test.  Any issue Defendant, Dr. Sochor or Defendant's other experts wish to take with the details of, or conclusions drawn from, that methodology must be presented to the jury.

Plaintiffs adopt and incorporate the attached affidavit of Dr. Ziejewski (Exhibit 6), in which he refutes the specific criticisms of Defendants and their experts; thus:

- He reviews his considerable education and experience relative to his assignment in this case (Id., Section I, pp. 1-3);

- He summarizes his methodology (Id., Section II, pp. 3-5);

- He refutes miscellaneous other criticisms and misrepresentations which do not pertain to his methodology (Id., Section III, pp. 5-11).

## CONCLUSION

In *Westberry v. Gislaved Gummi AB* (178 F.3d 257, 261 – C.A.4 1999), the court held (quotation merged, citations omitted):

> [T]he court should be mindful that Rule 702 was intended to liberalize the introduction of relevant expert evidence.  And, the court need not determine that the expert testimony a litigant seeks to offer into evidence is irrefutable or certainly correct.  As with all other admissible evidence, expert testimony is subject to being tested by vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.

Plaintiffs have demonstrated that Mr. Munsell and Dr. Ziejewski have employed methodologies to this case which are so fundamental to the scientific method that they are universally accepted.  They applied those methodologies to the peculiar facts of the subject accident to assist the jurors in answering questions not only relevant but integral to a just

determination of the issues at bar.  Defendant's attacks constitute nothing more than cross-examination, which should be reserved for trial.  Plaintiffs therefore ask that the Court deny these motions.

s/Jason E. Robinson
Jason E. Robinson, OBA #22289
DENNEY & BARRETT, P.C.
870 Copperfield Dr.
Norman, OK 73072
Tel:  405-364-8600
Fax:  405-364-3980
E-mail: jrobinson@dennbarr.com

and

J. Anthony Goebel
GOEBEL LAW OFFICE
1034 Copperfield Drive
Georgetown, Indiana 47122
Tel:  812-951-2500
Fax:  812-951-2522
E-mail:  tony@goebellawoffice.com

*Attorney for Plaintiffs Carla Yeager,
Individually, and Kayla M. Yeager,
Individually and as Mother and Special
Administrator of the Estates of M.L.L.S. and
B.D.S.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of June, 2018, a copy of this pleading was filed electronically.  Notice of filing will be sent to the following counsel by operation of the Court's electronic filing system.  Parties may access this document through the Court's electronic filing system.

Nicholas F. Stein, Esq.
Amy R. Wheatley, Esq.
LAW OFFICE OF NICK STEIN
810 East Market Street
New Albany, IN  47150
Tel: 812-948-6000
Fax: 812-948-6392

Email:  nick@nicksteinlaw.com

*Attorney for Plaintiff Dawn Summers, Personal*
*Representative of the Estate of Steven J. Summers*

Larry R. Church, Esq.
Marc Tawfik, Esq.
MCNEELY STEPHENSON
318 Pearl Street, Suite 200
New Albany, IN 47150
Tel: 812-725-8224
Fax: 317-825-5205
Email: larry.r.church@msth.com
        steven.p.langdon@msth.com
        marc.tawfik@msth.com

Richard P. Cassetta, Esq.
Dan H. Ball, Esq.
Bryan Cave LLP
One Metropolitan Square
211 N. Broadway, Suite 3600
St. Louis, MO 63102
Email: richard.cassetta@bryancave.com
        dhball@bryancave.com

*Counsel for Defendant, Evenflo Company, Inc.*


                                        s/Jason E. Robinson
                                        Jason E. Robinson